1

2

3

4

5

6

7

8

9                        UNITED STATES DISTRICT COURT

10                      EASTERN DISTRICT OF CALIFORNIA

11

12 KEVIN HUGHEY & JESSICA HUGHEY,      No.  2:14-cv-00037-TLN-AC

13                Plaintiffs,

14        v.                                **ORDER RE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

15 DAN DRUMMOND, CITY OF WEST SACRAMENTO, CHRISTOPHER

16 WRIGHT, KENNETH FELLOWS, TOD SOCKMAN, GERRIT MARKUS, TRENT

17 TYLER, & NATHAN STEELE

18                Defendants.

19

20        This matter is before the Court on Defendants Dan Drummond ("Drummond"), City of

21 West Sacramento (the "City"),[1] Kenneth Fellows ("Fellows"), Tod Sockman ("Sockman"), Gerrit

22 Markus ("Markus"), Trent Tyler ("Tyler"), and Nathan Steele ("Steele") (collectively

23 "Defendants") Motion to Dismiss Plaintiffs' Mr. and Mrs. Hughey's (collectively "Plaintiffs")

24 Second Amended Complaint ("SAC").[2]  (ECF Nos. 50, 45.)  For the reasons discussed below, the

25 motion to dismiss is GRANTED IN PART and DENIED IN PART.

26    _____

[1]      The factual allegations in the SAC refer primarily to the West Sacramento Police Department ("WSPD")

27 and its officers.  The Court refers to a single public entity defendant, the City, with the understanding that the WSPD is a division of the City.

[2]      Defendant Wright does not join in the instant Defendants' motion to dismiss.  Wright has answered the

28 SAC.  (ECF No. 48.)

1        **I.      FACTUAL ALLEGATIONS**

2        In summary,[3] WSPD officers Wright, Markus, and Tyler arrived at the Hughey residence

3    on the night of July 9, 2012, in response to a 9-1-1 call regarding a domestic disturbance at

4    Plaintiffs' residence.  Plaintiffs allege that upon arrival, Wright kicked in the door to the home

5    and shot Mr. Hughey in the abdomen without provocation.  Immediately after the shooting and

6    during the subsequent investigation, Wright allegedly fabricated a false version of the events that

7    occurred in order to minimize his culpability.  (SAC ¶¶ 9–23.)

8        Following the shooting, Mr. Hughey was taken to the hospital and underwent surgery.

9    His arraignment occurred without his presence and he posted bond on July 13, 2012.  Until his

10   bond was posted, Mr. Hughey remained in the custody of the WSPD and was confined to his

11   hospital room.  While hospitalized, Mr. Hughey missed the birth of Plaintiffs' son.  Mr. Hughey

12   was discharged from the hospital on July 15, 2012.  (SAC ¶¶ 29–47.)

13       Immediately following the shooting and later that night, WSPD officers entered the

14   Hughey residence and seized two laptops and a cell phone, for which they later obtained a

15   warrant to search.  Plaintiffs allege that on July 10, 2012, the WSPD falsely reported to

16   Sacramento media sources that an officer had shot a man who was reaching for the officer's gun.

17   (SAC ¶¶ 28, 31–32.)

18       Defendant Fellows, the lead detective investigating the matter, engaged in harassing and

19   defamatory behavior toward Plaintiffs throughout the course of the investigation.  Plaintiffs assert

20   that as a result of the shooting and investigation, Mrs. Hughey lost custody of her toddler son,

21   with whom she shared custody with her ex-husband.  (SAC ¶¶ 51–56.)

22       The Yolo County district attorney eventually brought felony charges against Mr. Hughey

23   based on the events occurring the night of July 9, 2012.  Plaintiffs state that at the preliminary

24   hearing in March, 2013, officers present on the night of the shooting testified falsely as to what

25   prompted the shooting.  Plaintiffs allege generally that the WSPD delayed in investigating the

26   incident and attempted to cover up the true events that occurred.  In May 2013, the WSPD issued

27   ───────────────

28   [3]      More detailed allegations, relative to the individual causes of action, are stated as necessary, *infra*.  The
     Court has given a fuller statement of the factual allegations in a prior order on November 6, 2014.  (ECF No. 33.)

a written determination of excessive force against Wright.  Wright was subsequently terminated.  In December 2013, the Yolo County Superior Court dismissed with prejudice the criminal charges against Mr. Hughey related to the shooting.  (SAC ¶¶ 51–90.)

## II.    PROCEDURAL HISTORY

Plaintiffs filed the original complaint on January 1, 2014, and a first amended complaint on November 20, 2014.   (ECF Nos. 1 & 34.)  On July 16, 2015, this Court granted and denied in part Defendants' motion to dismiss the first amended complaint.  (ECF Nos. 35, 41.)  Plaintiffs filed the instant SAC on August 15, 2015.  (ECF No. 45.)  On September 17, 2015, Defendants filed a motion to partially dismiss the SAC.[4]  (ECF No. 50.)  Plaintiffs filed an opposition and Defendants filed a reply.  (ECF Nos. 52, 54.)

Defendants move only to dismiss the federal claims.[5]  The claims are each brought under 42 U.S.C. § 1983.  Some claims are brought by both Plaintiffs and others are brought by an individual Plaintiff.  The claims, stated here essentially verbatim, are:

- Claim 11 (Mr. Hughey): Excessive Use of Force by the City and Wright;

- Claim 12 (both Plaintiffs): Violation of Right to Privacy – Unlawful Entry by the City, Wright, Fellows, Sockman, Markus, and Tyler;

- Claim 13 (both Plaintiffs): Excessive Use of Force and Unreasonable Seizure by the City and Wright;

- Claim 14 (Mr. Hughey): Excessive Use of Force and Unreasonable Seizure by the City, Wright, Markus, and Tyler;

- Claim 15 (Mrs. Hughey): Excessive Use of Force and Unreasonable Seizure by the

---

[4]     Defendants request the Court take judicial notice of Search Warrant No. 12-197 to search Plaintiffs' computers and cellphones, Search Warrant No. 12-198 to search the person of Mr. Hughey and obtain DNA swabs, the PACER docket in *Macias et al v. Godden et al.*, Eastern District of California case No. 2:08-cv-00895-MCE-JFM, and the PACER docket in *Galven-Magana v. City of West Sacramento et al.*, Eastern District of California case No. 2:06-cv-01665-LKK-DAD.  (Req. for Judicial Notice, ECF No. 50-2.)  Under Federal Rule of Evidence 201 a court can take judicial notice of a document when the subject "can be accurately and readily determined from the sources whose accuracy cannot reasonably be questioned."  For the reasons stated in Defendants' request and noting no opposition by Plaintiffs to the request, the Court GRANTS Defendants' request, and takes judicial notice of the attached exhibits pursuant to Federal Rule of Evidence 201 (ECF No. 50–2 at 3–34).

[5]     Mr. Hughey brings ten state law claims in connection with the facts.  The state law claims are: 1) assault; 2) battery; 3) negligence; 4) intentional infliction of emotional distress; 5) defamation; 6) intrusion (invasion of privacy); 7) false arrest – false imprisonment; 8) trespass to land; 9) trespass to chattels; and 10) conversion.

1     City and Markus;

2     • Claim 16 (Mr. Hughey): Excessive Use of Force and Unlawful Arrest by the City,

3       Sockman, and Fellows;

4     • Claim 17 (Mr. Hughey): Unreasonable Search of Mr. Hughey's Person by the City and

5       Fellows;

6     • Claim 18 (both Plaintiffs): Unreasonable Search of the Hughey's Home without a

7       Valid Warrant by the City, Sockman, and Fellows;

8     • Claim 19 (both Plaintiffs): Failure to Train and Supervise by the City, Drummond, and

9       Sockman.

10    Defendants move for dismissal both on the basis that Plaintiffs fail to plead adequate facts

11    to withstand dismissal and that individual Defendants are entitled to qualified immunity.  The

12    Court first addresses whether there are adequate facts pled for each cause of action.  If so, the

13    Court next addresses whether individual Defendants are entitled to qualified immunity.

14    **III.    STATUTORY FRAMEWORK**

15       A.    Standard of Review: Motion to Dismiss

16    Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain

17    statement of the claim showing that the pleader is entitled to relief."  On a motion to dismiss, the

18    factual allegations of the complaint are assumed to be true. *Cruz v. Beto*, 405 U.S. 319, 322

19    (1972).  A court is bound to give plaintiff the benefit of every reasonable inference to be drawn

20    from the well-pleaded allegations of the complaint.  *Retail Clerks Int'l Ass'n v. Schermerhorn*,

21    373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege "'specific facts' beyond those necessary

22    to state his claim and the grounds showing entitlement to relief."  *Bell Atlantic v. Twombly*, 550

23    U.S. 544, 570 (2007) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2009)).  "A claim

24    has facial plausibility when the pleaded factual content allows the court to draw the reasonable

25    inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S.

26    662, 678–79 (citing *Twombly*, 550 U.S. at 556).

27    Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of

28    factual allegations."  *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir.

4

1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Additionally, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id*. at 678.  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

B.     Qualified Immunity

Qualified immunity protects government officers from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability...it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis deleted)). The Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

To determine whether an officer is entitled to qualified immunity, courts ask (1) whether the alleged misconduct violated a right and (2) whether the right was "clearly established" at the time of the alleged misconduct. *Id.* at 223–25. The Court decides in its discretion whether to

5

1    address the first or second prong first.  However, if the Court initially addresses the first prong

2    and finds that no constitutional right was violated under the alleged facts, the inquiry ends and

3    defendants prevail.  *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

4          "'[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a

5    motion for summary judgment must accept the more stringent standard applicable to this

6    procedural route.'"  *Romero v. Washoe Cty.*, No. 3:11-CV-00582-LRH, 2013 WL 5592269, at *2

7    (D. Nev. Oct. 9, 2013) (citing *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004)).  "Only

8    where a defendant's entitlement to qualified immunity can be established 'based [solely] on facts

9    appearing on the face of the complaint' is dismissal appropriate."  *Id.; Groten v. California,* 251

10   F.3d 844, 851 (9th Cir. 2001).  Further, "the plaintiff is entitled to all reasonable inferences from

11   the facts alleged, not only those that support his claim, but also those that defeat the immunity

12   defense."  *McKenna,* 386 F.3d at 436.  "A government official sued under Section 1983 is entitled

13   to qualified immunity at the motion to dismiss stage unless the Plaintiff pleads sufficient facts to

14   allege that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly

15   established' at the time of the challenged conduct."  *Garcia v. City of King City*, No. 14-CV-

16   01126-BLF, 2015 WL 1843944, at *1 (N.D. Cal. Apr. 8, 2015) (denying defendant's motion to

17   dismiss based on qualified immunity, without prejudice to renew at a later stage of the litigation).

18        **IV.   ANALYSIS**

19        A.    Claim 11 (Mr. Hughey): Excessive Force by the City and Wright

20         Defendant Wright has not moved to dismiss this cause action.  It appears that Mr. Hughey

21   bases this claim only on the shooting itself and not the ensuing events that occurred after other

22   officers entered the residence. (SAC ¶¶ 163–183.)   In summary, he alleges that Wright

23   unjustifiably kicked in the door of Plaintiffs' home and shot Mr. Hughey.  (SAC ¶¶ 9–13.)

24   Construing these allegations in favor of Plaintiff, he states a claim against Wright for excessive

25   force under the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386 394–95 (1989) (*"all*

26   claims that law enforcement officers have used excessive force—deadly or not—in the course of

27   an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the

28   Fourth Amendment …")

Mr. Hughey also attempts to state a claim for excessive force against the City.  As the City, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep.'t of Social Servs.,* 436 U.S. 658, 694 (1978).  A plaintiff may show: (1) a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) a relevant decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate. *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)) (internal quotation marks and citations omitted).  "The custom must be so 'persistent and widespread' that it constitutes a permanent and well settled city policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

Further, the "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989).  "*Monell* will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent city policy. Moreover, the identified deficiency in the training program must be closely related to the ultimate injury." *Id.*

Plaintiff argues "WSPD has a policy and custom of routinely and intentionally

encouraging the excessive use of force by its officers." (ECF No. 52 at 9.) Specifically, Plaintiff alleges:

- Prior to becoming a police officer, Wright served in the military. Afterwards, he went to work for the Sacramento Police Department, where he was to receive 24 hours of training defensive tactics on October 14, 2011, but failed to complete the course. Wright was terminated in January 2012, but was immediately hired by WSPD. WSPD personnel presumably performed a background check, making supervisors aware of Wright's experience and history. (SAC ¶¶ 168–169.)

- While employed by WSPD, Wright posted on his Facebook page a picture of him posing with a fully automatic assault rifle while in his street clothes, thus supporting an inference that the WSPD was aware Wright was trained in combat. (SAC ¶ 170.)

- Wright was told on more than one occasion by his WSPD Field Supervising Officer that he needed to "slow down." (SAC ¶ 171.) On this occasion Wright did not follow standard procedures as evidenced by his failure to activate his audio, making entry without his partner, and making entry without trying to communicate with the occupants. (SAC ¶ 171.) When the instant shooting occurred, Wright "had yet to pass probation." (SAC ¶ 172.) "In short, WSPD supervisors were aware of specific issues with Officer Wright and still armed him with a gun and sent him out on his own." (SAC ¶ 173.) Defendants Sockman and Drummond exercised some supervisory role over Wright and failed to "take adequate action to prevent Officer [Wright's] wrongful conduct or by expressly or implicitly approving Wright's wrongful conduct." (SAC ¶¶ 181–183.)

- Plaintiffs allege and/or cite other specific instances of police excessive force by WSPD officers, occurring in 2006 and 2011–2014, including another incident involving the Hugheys and multiple excessive force claims filed against Defendant Fellows. (SAC ¶¶ 104–113.)

Defendants counter that the above-stated allegations are not sufficient to state a cause of action for municipal liability. Defendants submit Plaintiffs have admitted the shooting violated

City policy (SAC ¶ 65).  Additionally, Plaintiffs have admitted Defendant Markus activated his audio.  (SAC ¶ 26).  There is no clear connection between the other cited incidents of WSPD police misconduct and the instant case.  For example, two of the cited cases were settled before trial without substantive rulings.[6]  *See Simms v. City of N.Y.*, 480 F. Appx. 627, 630 (2d Cir. 2012) (finding existence of a suit against city police insufficient to establish a *Monell* custom where no violation had been found).  In the case against Defendant Fellows referenced by Plaintiffs, there was no deadly force claim and he prevailed on summary judgment and then was affirmed on appeal.[7]  The cases cited by Plaintiffs also occurred over a long time span.  Relatively speaking, those cases represent a low proportion of excessive force incidents to non-excessive force incidents.  With respect to allegations of insufficient training, Defendants argue essentially that evidence of a single officer's inadequate training does not establish municipal liability.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (affirming a grant of summary judgment in favor of the municipality).  Defendants also argue Plaintiffs do not demonstrate that failing to give veterans extra training as law enforcement officers constitutes the City's deliberate indifference to the citizens to whom WSPD officers come in contact with.

Plaintiffs have cited other cases involving excessive force by the WSPD and submit that these cases support a practice or custom on the part of the WSPD.  This Court agrees and finds that Plaintiff adequately alleges the WSPD has a "longstanding practice or custom" of encouraging excessive force by its officers.  *Menotti*, 409 F.3d at 1147.  Defendants cite cases in support of their argument that City is not liable.  However, these cases dealt with final judgments or summary judgments.  (ECF No. 50-1 at 12–15.)  *See e.g. Canton*, *supra*; *Blankenhorn*, *supra*; *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006); *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985); *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).  For example, whether the WSPD actually encourages excessive force by permitting officers to not activate their audio devices is a factual issue to be resolved at a later stage in this

---

[6]     *Macias*, 2:08-cv-00895 (E.D. Cal.); *Galvan-Magana*, 2:06-cv-01665 (E.D. Cal).
[7]     *Falconer v. City of W. Sacramento*, 2011 Cal. App. Unpub. LEXIS 5588, *11 and *15 (2011).

1    litigation.  Whether that is true requires factual inquiry.  The above-stated allegations "give fair

2    notice and [] enable the [City] to defend itself effectively," and taken as true they plausibly

3    suggest an entitlement to relief.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Therefore,

4    Plaintiffs meet the pleading requirements to survive a motion to dismiss.  *See also Mateos–*

5    *Sandoval v. County of Sonoma,* No. C11–5817 THE, 2013 WL 415600, at *5 (N.D. Cal. Jan.31,

6    2013); *Boarman v. Cty. of Sacramento*, No. 2:11-CV-02825 KJM, 2013 WL 1326196, at *4 (E.D.

7    Cal. Mar. 29, 2013).  Defendants' motion to dismiss Claim 11 in the second amended complaint

8    is DENIED.

9        B.     Claim 12 (both Plaintiffs): Violation of Right to Privacy – Unlawful Entry by the

10                City, Wright, Fellows, Sockman, Markus, and Tyler

11      Defendants contend that Markus, Tyler, Fellows, and Sockman did not violate Plaintiffs'

12    right to privacy because they were entitled to enter the home under exigent circumstances to

13    render aid to Mr. Hughey and to later investigate the incident.[8]  (ECF No. 50-1 at 7–9.)  Plaintiffs

14    assert Marks and Tyler should have waited outside and that Fellows and Sockman needed to gain

15    consent to enter the next day.  (ECF No. 52 at 12.)

16      The Fourth Amendment protects against unlawful searches and seizures.  The Supreme

17    Court has inferred from the text of the Fourth Amendment that a warrant must usually be secured

18    before a search or entry.  *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016).  However, "a

19    warrantless entry by criminal law enforcement officials may be legal when there is compelling

20    need for official action and no time to secure a warrant."  *Michigan v. Tyler*, 436 U.S. 499, 509

21    (1978); *see also Warden v. Hayden*, 387 U.S. 294, 299 (1967) (upholding warrantless entry of a

22    house by police in pursuit of armed robber); *United States v. Santana*, 427 U.S. 38, 42–43 (1976)

23    (warrantless entry justified by exigent circumstances).

24      *i.*     *Markus and Tyler*

25      Plaintiffs sought to state a similar claim against Markus and Tyler in the FAC, under a

26    state law cause of action.  This Court noted in its previous order that it is undisputed Wright,

27

---

28    [8]      Wright has not joined the instant motion to dismiss.  Therefore, Plaintiffs' claim for unlawful entry against Wright survives.

1    Markus, and Tyler arrived at the residence because of a call to police regarding a domestic

2    disturbance.[9]  Subsequently Wright shot Mr. Hughey and afterwards Markus and Tyler entered

3    the residence.  Plaintiffs appear to allege Markus and Tyler did not directly see Mr. Hughey as he

4    was shot, and these officers relied upon Wright's account of the shooting in the aftermath.[10]

5    Plaintiff also alleges that Markus and Wright engaged in a "collusion and conspiracy" to cover up

6    the true justification for the shooting.  (SAC ¶ 17.)  However, this allegation is not particularly

7    relevant to whether, at the moment the shooting occurred and then shortly afterwards when

8    Markus and Tyler entered the home, there were exigent circumstances justifying Markus's and

9    Wright's entry.

10        Overall, the facts pled, accepted as true, establish that the shooting created exigent

11   circumstances for Markus and Tyler to enter the residence.  *Welsh v. Wisconsin*, 466 U.S. 740,

12   749–50 (1984); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990).  (ECF No. 41 at 13, 23.)  "Under

13   the emergency aid exception [] officers may enter a home without a warrant to render emergency

14   assistance to an injured occupant or to protect an occupant from imminent injury."  *Kentucky v.*

15   *King*, 563 U.S. 452, 460 (2011) (internal quotations omitted).  For the emergency aid exception to

16   apply the officers must have an objectively reasonable belief that someone inside the home is

17   seriously injured, under threat of injury, or needs serious aid.  *Brigham City, Utah v. Stuart*, 547

18   U.S. 398, 403–04 (2006).  Here, Plaintiffs allege the door to the Hughey home was forced in and

19

20   [9]    Plaintiffs do not allege information regarding the domestic disturbance call that resulted in the Defendants
     being dispatched to the Hughey residence.  However, the Court took judicial notice of the warrant obtained to search

21   the Hughey's electronic devices.  In support of the warrant, an affiant explained that police received a call from a
     reporting party who stated that her husband had attacked her and was going to attack her again.  (ECF No. 50-2, Ex.

22   A at 1.)  This call precipitated Defendants presence at the Hughey residence.  In some circumstances a report of
     domestic disturbance may constitute exigent circumstances to enter a home without a warrant.  *See U.S. v. Black*, 482

23   F.3d 1035, 1039–40 (9th Cir. 2006) (finding exigent circumstances where the police "feared that [the victim] could
     have been inside the apartment, badly injured and in need of medical attention"); *but see Thomas v. Dillard*, 818 F.3d

24   864, 882 (9th Cir. 2016) (finding that a warrant was necessary in a search because there was no sign of an ongoing or
     completed domestic violence and the proposed perpetrator was neither aggressive nor confrontational to police).

25   Because the Court finds the shooting clearly established exigent circumstances, the Court does not reach a finding on
     whether the circumstances in the instant case would rise to the level necessary to permit a warrantless entry in a

26   domestic disturbance incident.
     [10]   Plaintiffs provide no detail on where Tyler was when the shooting occurred.  Plaintiffs state Markus "was

27   coming around the corner of the row of four homes, literally seconds away and [] saw the muzzle flash from
     [Wright's] shooting of Mr. Hughey … [He] inquired into what had happened that would cause an unarmed man to be

28   shot within his home.  [Wright] immediately lied and stated that Mr. Hughey reached for his gun in an effort to cover
     up [Wright's] wrongful act."  (SAC ¶ 16.)

1  Mr. Hughey was immediately shot while still inside the home.  (*See* SAC ¶¶ 12–15.)

2  Specifically, Plaintiffs allege that "Mr. Hughey was located at the end of the foyer, about six or

3  seven feet inside the house" after he was shot.  (SAC ¶ 15.)  There are no facts suggesting that the

4  door to the residence closed after Wright entered the foyer.  Therefore, Markus and Taylor were

5  able to see inside the home and could form a reasonable belief that Mr. Hughey was seriously

6  injured based on the "blood gushing from his left side."  (SAC ¶ 13.)  Plaintiffs further admit that

7  Mr. Hughey was "rushed for emergency, life-saving surgery" cementing the need for emergency

8  aid.  (SAC ¶ 17.)The case law does not require that Markus and Tyler call for additional

9  personnel and the ambulance from outside the home, as Plaintiffs suggest they should have done.

10  (ECF No. 52 at 12.)

11       Furthermore, if the facts pled did lead to a plausible claim for unlawful entry and/or a

12  violation of the right to privacy by these Defendants, they are entitled to qualified immunity.

13  Plaintiffs plead no facts supporting a claim that it is a violation of a clearly established right for

14  an officer responding to a domestic violence call to enter a home immediately upon hearing

15  and/or witnessing a shooting that has just occurred within the home.  Therefore, Defendants'

16  motion to dismiss Claim 12 against Markus and Tyler is GRANTED.

17       ii.    *Fellows and Sockman*

18       The Court notes that Plaintiffs have brought a separate claim, claim 18, for an unlawful

19  warrantless search of the home by Sockman and Fellows.  The Court considers facts relevant to

20  that claim separately.  Here, the Court considers just whether Plaintiffs state a claim for the

21  unlawful entry itself by Sockman and Fellows.  As to Fellows and Sockman, Plaintiffs allege they

22  "intentionally entered Plaintiffs' home while acting in the performance of their official duties and

23  under the color of law.  Defendants['] conduct violated Plaintiffs' right to privacy and Plaintiffs

24  were harmed."  (SAC ¶ 186.)  "After Hughey's forced removal and despite having secured the

25  home, [Fellows and Sockman] unlawfully entered the Hughey home without a warrant and

26  without exigent circumstances."  (SAC ¶ 187.)

27       Defendants argue that once Markus and Tyler entered the house, no right of privacy

28  remained against other officers (including Fellows and Sockman) to enter the house to

1   investigate.  (ECF No. 50-1 at 8.)  Defendants cite *United States v. Rubio*, 727 F.2d 786, 796–97

2   (9th Cir. 1983), which held, "[o]nce consent has been obtained from one with authority to give it,

3   any expectation of privacy has been lost.  We seriously doubt that the entry of additional officers

4   would further diminish the consenter's expectation of privacy, and, in the instant case, any

5   remaining expectation of privacy was outweighed by the legitimate concern for the safety of a

6   single officer conducting a search of a house known to contain firearms."  However, this holding

7   is inapposite, because Plaintiffs do not allege they consented to entry by Wright, Markus, or

8   Tyler.  Plaintiffs' position is that they did not give consent, and that Sockman and Fellows

9   unlawfully entered the home without a warrant notwithstanding this lack of consent.

10          Defendants also argue the shooting created a potential felony situation, which the officers

11   were entitled to investigate by promptly viewing the scene.  (ECF No. 50-1 at 9.)  In support,

12   Defendants cite *Michigan v. Tyler*, which held: "In summation … entry to fight a fire requires no

13   warrant, and that once in the building, officials may remain there for a reasonable time to

14   investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire

15   must be made pursuant to the warrant procedures governing administrative searches." *Tyler*, 436

16   U.S. at 511.  Those facts (involving a fire and the ensuing investigation) are clearly not analogous

17   to the instant case.  However, the Supreme Court's ultimate conclusion is beneficial in the instant

18   case, "additional entries to investigate" must be made pursuant to a warrant. *Id.* at 511.  In

19   *People v. Boragno*, the California Fifth District Court of Appeals held that once an initial

20   emergency ceased to exist a subsequent entry without a warrant was unlawful.  232 Cal. App. 3d

21   378, 386–87 (1991) (citing *Mincey v. Arizona*, 437 U.S. 385, 395 (1978) for the proposition that

22   there is no murder scene or assault exception to the warrant requirement).  Here, Plaintiffs allege

23   that "Fellows and Lt. Sockman unlawfully entered the Hughey home without a warrant and

24   without exigent circumstances" after Mr. Hughey had already been "forcibly removed."  (SAC ¶

25   187.)  The initial emergency situation surrounding Mr Hughey, whether from the shooting or the

26   domestic violence incident, ceased to exist prior to Sockman and Fellows entry.[11]  Therefore,

27

28   ---
     [11]      As stated in the Court's previous order (ECF No. 41 at 3, n. 3) it is the Court's understanding that the
     Sacramento Superior Court eventually found there was sufficient evidence to bring charges against Mr. Hughey

1  Plaintiffs have adequately plead a claim for warrantless entry against Sockman and Fellows.

2  Defendants' motion to dismiss Claim 12 against Fellows and Sockman is DENIED.

3       C.  <u>Claim 13 (both Plaintiffs): Excessive Use of Force and Unreasonable Seizure of</u>

4          <u>Plaintiffs in their Home by the City and Wright</u>

5  "A person is seized by the police and thus entitled to challenge the government's action

6  under the Fourth Amendment when the officer, by means of physical force or show of authority,

7  terminates or restrains his freedom of movement through means intentionally applied." *Brendlin*

8  *v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted). "A

9  person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of

10  the circumstances surrounding the incident, a reasonable person would have believed that he was

11  not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of

12  circumstances that might indicate a seizure, even where the person did not attempt to leave,

13  would be the threatening presence of several officers, the display of a weapon by an officer, some

14  physical touching of the person of the citizen, or the use of language or tone of voice indicating

15  that compliance with the officer's request might be compelled." *Id.*

16      The Court has already addressed liability on the part of Wright and the City, with respect

17  to excessive force directed at Mr. Hughey.[12]  It appears an additional relevant allegation would be

18  that immediately after the shooting, Wright pointed his weapon at Mr. Hughey and ordered him to

19  the ground.  (SAC ¶ 191.)  For the same reasons, the Court finds Mr. Hughey states a claim for a

20  "seizure" under the Fourth Amendment against Wright and the City.

21      With respect to Mrs. Hughey, the relevant allegation is that immediately after the shooting

22  occurred, Wright yelled at Mrs. Hughey and ordered her to the ground with his weapon drawn.

23  (SAC ¶¶ 14, 119.)  This allegation similarly states a claim for an unlawful seizure because a

24  reasonable person would not feel she was free to leave rather than obey the officer's command to

25  get on the floor.  *Brendlin*, 551 U.S. at 254; *Mendenhall*, 446 U.S. at 554.  For the reasons stated,

26  _____

related to domestic violence and for charges related to resisting arrest and attempting to remove Wright's firearm.
27  (*See* Transcript of Preliminary Hearing, Def.'s Request for Judicial Notice, ECF No. 35-3.)  Conduct underlying both
sets of charges occurred on July 9, 2012.  Eventually, Mr. Hughey pled guilty to misdemeanor corporal injury. The
28  felony charges related to resisting arrest and removing Wright's firearm were dismissed with prejudice.
[12]      See *supra* section IV, subsection A.

1    *supra*, regarding *Monell* liability on the part of the City for encouraging excessive force, the

2    Court finds Mrs. Hughey states a claim against the City for a seizure.  Therefore, Defendants'

3    motion to dismiss Claim 13 is DENIED.

4       D.   Claim 14 (Mr. Hughey): Excessive Use of Force and Unreasonable Seizure by the

5            City, Wright, Markus, and Tyler

6            i.   *Wright and City*

7    Claim 14 adds the allegation that Mr. Hughey was "aggressively hand-cuffed at gunpoint"

8    by Wright, Markus, and Tyler.  (SAC ¶ 195.)  Besides this new "aggressive handcuffing"

9    allegation, Plaintiffs rely on the same facts as the previous claim to support their excessive force

10   and unreasonable seizure claim against Wright.  With respect to the handcuffing, Defendants

11   allege that handcuffing an arrestee incident to seizure and in anticipation of transport is

12   reasonable to affect an arrest and to protect the officers during transport.  Defendants further

13   assert that handcuffing is not actionable absent allegations of demonstrable physical injury or

14   unheeded complaints about excessive tightness.  (ECF No. 50-1 at 15.)  *See Dillman v. Tuolumne*

15   *Cty.*, No. 1:13-CV-00404 LJO, 2013 WL 1907379, at *8 (E.D. Cal. May 7, 2013) (collecting

16   cases); *Wall v. Cty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) ("It is well-established that

17   overly tight handcuffing can constitute excessive force"); *Neague v. Cynkar*, 258 F.3d 504, 508

18   (6th Cir. 2001) ("when there is no allegation of physical injury, the handcuffing of an individual

19   incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force

20   under the Fourth Amendment").  The Court agrees.

21   Plaintiffs' allegation that Wright "aggressively" handcuffed Mr. Hughey is the only

22   allegation in support of this new excessive force claim against Wright.  Plaintiffs have not made

23   any allegations about the tightness of the handcuffs or physical injury arising from Defendants

24   handcuffing Mr. Hughey.  Absent this allegation, Claim 14 is merely a replication of Claim 13.

25   The Court has already addressed liability on the part of Wright and the City, with respect to

26   excessive force directed at Mr. Hughey and unlawful seizure.[13]  To find liability on the part of

27

28   [13]      See *supra* section IV, subsection A and section IV, subsection C.

City for the same actions of Wright alleged in Claim 13 would permit Plaintiffs to sue for the same actions in two separate claims.  Asserting two identical claims in a law suit is redundant and courts are permitted to strike redundant claims pursuant to Federal Rule of Civil Procedure 12(f).  As Plaintiffs attempted to allege new facts separating the two claims, the Court refrains from striking the claim and instead, GRANTS Defendants' motion to dismiss as to the City with leave to file an amended complaint.

For the reasons stated below, the Court does not find Plaintiffs have alleged liability on the part of the City, based upon the acts committed by Markus, Tyler, or those unnamed defendants responsible for the blood draw and transporting Mr. Hughey to the hospital.  Therefore, Defendants' motion to dismiss Claim 14 with respect to the City is GRANTED as to the actions of Wright, Markus, Tyler and the unnamed defendants.

     *ii.  Markus and Tyler*

The relevant allegations are that after Mr. Hughey was shot, he was "aggressively hand-cuffed at gunpoint" by Wright, Tyler, and Markus.  (SAC ¶ 195.)  Plaintiffs do not identify which officer applied the handcuffs to Mr. Hughey, but make the allegation generally against all three officers.  Mr. Hughey "was then forcibly removed from his home."  (SAC ¶ 196.)  The WSPD "performed an unconsented blood draw on Mr. Hughey in the ambulance while Mr. Hughey was bleeding out."  (SAC ¶ 197.)  After surgery, Mr. Hughey was physically shackled to his hospital bed by Fellows.[14]  (SAC ¶ 198.)

As discussed above, Plaintiffs have not alleged facts beyond an "aggressive" handcuffing that would make this handcuffing by Markus and Tyler actionable under the Fourth Amendment.  Overall, Plaintiffs' position is that there was no justification for the handcuffing, because Wright unjustifiably shot him.  (ECF No. 52 at 9.)  However, Plaintiffs allege that Wright told Markus that Mr. Hughey had reached for Wright's gun, and it is undisputed that these Defendants were responding to a domestic violence call.  The Court understands that Mr. Hughey was charged with domestic violence and eventually pled guilty to misdemeanor corporal injury, in connection

---

[14]     Plaintiffs do not bring this cause of action against Fellows.

1    with conduct occurring on the night of the shooting.  Plaintiffs have alleged that Markus and

2    Wright colluded to fabricate a version of the events.  (SAC ¶ 17.)  However overall, Plaintiffs

3    appear to state that Markus did not directly see the shooting.  Plaintiffs do not mention where

4    Tyler was specifically.  (SAC ¶ 16: Markus "was coming around the corner of the row of four

5    homes, literally seconds away and [] saw the muzzle flash from [Wright's] shooting of Mr.

6    Hughey … [He] inquired into what had happened that would cause an unarmed man to be shot

7    within his home.  [Wright] immediately lied and stated that Mr. Hughey reached for his gun in an

8    effort to cover up [Wright's] wrongful act.")  In light of the information available to Markus and

9    Tyler at the time of Mr. Hughey's handcuffing,  the handcuffing was justified.  For these reasons,

10   the Court finds Plaintiffs have not alleged adequate facts to state a claim for excessive force and

11   unlawful seizure against Markus and Tyler, based on the handcuffing that occurred at the home.

12          As to the allegations that Mr. Hughey's blood was drawn and he was forcibly taken from

13   his home to the hospital, Plaintiffs do not allege in the SAC that Markus and Tyler committed

14   these acts.  "[O]nce a seizure has occurred, it continues through the time the arrestee is in the

15   custody of the arresting officers." *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985).

16   "Therefore, excessive use of force by a law enforcement officer in the course of transporting an

17   arrestee gives rise to a section 1983 claim based upon a violation of the Fourth Amendment." *Id.*

18   "The trip to the police station is a 'continuing seizure' during which the police are obliged to treat

19   their suspects in a reasonable manner." *Fontana v. Haskin*, 262 F.3d 871, 879–80 (9th Cir. 2001).

20          With respect to the blood draw, Plaintiffs also do not explain how the drawing of Mr.

21   Hughey's blood was part of an unlawful seizure beyond that necessary for his medical treatment

22   or that would suggest Markus and Tyler were treating Plaintiff in an unreasonable manner.

23   Plaintiffs allege the blood draw was "unconsented" but also allege he was "suffering shock and

24   bleeding out."  (SAC ¶ 197.)  Furthermore, Plaintiffs allege that Mr. Hughey received "life-saving

25   surgery," at the hospital.  (SAC ¶ 198.)  If Plaintiffs' reasoning is followed, numerous instances

26   of "excessive force" would have occurred as part of Mr. Hughey's medical treatment on the way

27   to the hospital and at the hospital even without Markus and Tyler present or participating.

28   Plaintiffs do not allege facts to distinguish the drawing of his blood from what the Court

1 understands to be an ongoing medical treatment that occurred immediately after the shooting and

2 in the days afterwards.  Plaintiffs do not identify cases that have found a Fourth Amendment

3 violation to occur, based on an allegation that a gunshot victim and suspected felon had his blood

4 drawn, albeit without his consent, on the way to the hospital for treatment.

5       With respect to his shackled transport to the hospital, Plaintiffs have alleged that Wright

6 told other officers, including Markus and Tyler, that Mr. Hughey reached for his firearm and

7 appears to state no other officers except Wright directly saw the shooting.  (SAC ¶¶ 17, 120, 195.)

8 "An officer is not liable for acting on information supplied by another officer, even if that

9 information later turns out to be wrong, if he has an objective reasonable, good-faith belief that he

10 is acting pursuant to proper authority.  *Espinosa v. City and County of San Francisco*, 598 F.3d

11 528, 535 (9th Cir. 2010) (citing *Motley v. Parks*, 432 F.3d 1072, 1081–82 (9th Cir. 2005)).

12 Again, the thrust of Plaintiff's allegations is that Wright shot Mr. Hughey outside the direct view

13 of any other officers, and then "immediately lied and stated that Mr. Hughey reached for his gun

14 in an effort to cover up" what had occurred.[15]   (SAC ¶ 16.)  It is undisputed that Wright, Markus,

15 and Tyler were responding to a domestic violence call.  Mr. Hughey was "bleeding out" from the

16 shooting.  Plaintiffs do not provide additional facts indicating that the transport to the hospital

17 violated Mr. Hughey's constitutional rights.  Instead, Plaintiffs repeat throughout the complaint

18 that Mr Hughey received "life-saving surgery" at the hospital.  (*See* SAC ¶¶ 17, 29, 198, 213.)

19 Based on the information available to Markus and Tyler at the time of the transport, namely the

20 statement of Wright, it was objectively reasonable to take precaution and shackle Mr. Hughey

21 during transport.  Thus, the Court does not find Plaintiffs plead adequate facts to sustain a cause

22 of action for excessive force and unlawful seizure based on Mr. Hughey's blood draw and

23 transport to the hospital.

24       Assuming *arguendo* that Mr. Hughey has pleaded facts adequate to state a claim against

25
26
27
28

---

[15]      The Court's construal of Plaintiffs' allegations is made more difficult by Plaintiffs' opposition, which alleges facts that are not in the SAC: "Markus concedes having witnessed the muzzle flash from outside the home without any struggle, and Tyler witnessed an unarmed Mr. Hughey being shot through the rear glass door and similarly without any altercation."  (ECF No. 52 at 6.)  However, in the second amended complaint Plaintiffs allege that "Markus was coming around the corner of the row of four homes" and saw the muzzle flash.  (SAC ¶ 16.)  Plaintiffs further stated that Markus "inquired into what had happened that would cause an unarmed man to be shot within his home."  (SAC ¶ 16.)

Markus, Tyler, other WSPD officers, or medical personnel who performed a blood draw, the pleaded facts as a whole are not sufficient to state that these individuals violated Mr. Hughey's clearly established constitutional rights.  Based on the facts above, other WSPD officers who entered the home afterwards to handcuff Mr. Hughey and transport him to the hospital, and medical personnel who drew Mr. Hughey's blood, would be entitled to qualified immunity. Plaintiffs do not plead facts showing that these officers violated a clearly established constitutional right.  Rather, the facts pled show that these individuals were dealing with the aftermath of a shooting which none of them directly saw, and it was objectively reasonable to handcuff Mr. Hughey, draw his blood, and transport him to the hospital.

Therefore, Defendants' motion to dismiss Claim 14 as to Markus and Tyler is GRANTED.

E.   Claim 15 (Mrs. Hughey): Excessive Use of Force and Unreasonable Seizure by the City and Markus

In summary, the relevant allegations for this claim are that, at some point after the shooting occurred:

- "Markus took Mrs. Hughey into a separate room in the house and did not allow her to leave or [have] access to her toddler son.  She was not free to leave until he [sic] responded to her [sic] questioning and she received no Miranda rights during the custodial seizure and interrogation."  (SAC ¶ 202.)

- "After officers entered the Hughey residence, Mrs. Hughey went upstairs with Officer [Markus] to check on her three-year-old son, who was in bed within his room.  After checking on her son, officers separated the child and Mrs. Hughey and told her they needed a statement before Mrs. Hughey could return to her son and before going to the hospital.  Mrs. Hughey just started having contractions as a result of the traumatic wrongful shooting.  Mrs. Hughey wanted medical attention because of her late-term pregnancy and the trauma she just suffered.  Mrs. Hughey felt pressured to provide a statement so she could return to her son and proceed to a medical center."  (SAC ¶ 21.)

1    "Although detention of witnesses for investigative purposes can be reasonable in certain

2    circumstances, such detentions must be minimally intrusive." *Maxwell v. Cty. of San Diego*, 708

3    F.3d 1075, 1083 (9th Cir. 2013). "[T]he state interests justifying investigative witness detentions

4    are lower than those justifying detention of suspected criminals." *Id.* at 1084 (referencing *Illinois*

5    *v. Lidster*, 540 U.S. 419 (2004)). In deciding whether the detention was reasonable, the court

6    must look to "the gravity of the public concerns served by the seizure, the degree to which the

7    seizure advances the public interest, and the severity of the interference with individual liberty."

8    *Id.* at 1083 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). "[D]etention without suspicion of

9    criminal activity involved a lesser state interest than a detention based on such suspicion." *Id.* at

10   1084. "[I]n the hierarchy of state interests justifying detention, the interest in detaining witnesses

11   for information is of relatively low value." *Id.* Fourth Amendment reasonableness "is measured

12   in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S.

13   33, 34 (1996); *see Littler v. Bay Area Rapid Transit District (BART)*, No. 14-cv-05072-DMR,

14   2016 WL 1734095, at *7 (N.D. Cal. April 29, 2016) (finding that the witnesses detention was

15   reasonable as it furthered public concern because she was an eye witness to a battery and the

16   detention was short, lasting only five minutes); *Emrit v. Sandoval*, No. 2:14-cv-01759-APG-NJK,

17   2015 WL 669041, at *3 (D. Nev. Feb. 17, 2015) (finding that an allegation that only states the

18   police detained a witness is not enough for a court to determine reasonableness under the

19   circumstances).

20           Defendants argue that Mrs. Hughey was "detained for questioning as a witness to a

21   shooting and possible domestic violence. Since Mrs. Hughey was the only third-party witness to

22   the shooting, and Wright's version radically diverged from Mr. Hughey's her statement was

23   vitally important." (ECF No. 50–1 at 10.) However, drawing the facts alleged in favor of Mrs.

24   Hughey, she states a claim for an unlawful detention under the Fourth Amendment. Plaintiffs'

25   allege Mrs. Hughey was separated from her toddler son. She was not free to leave. She was told

26   she could not return to her son before giving a statement. She started having contractions because

27

28

20

1   she was at the end of her pregnancy and she wanted medical attention.[17]

2          Whether those acts constitute a detention that is more than "minimally intrusive,"

3   *Maxwell*, 708 F.3d at 1083, is a question of fact that is inappropriate to resolve on a motion to

4   dismiss.  Likewise, whether Markus's actions violated a clearly established constitutional right –

5   preventing a pregnant woman from leaving and/or from being with her toddler son – is an issue

6   that may not properly be resolved on a motion to dismiss; there are adequate facts pled that,

7   accepted as true, may counter qualified immunity.  Therefore, Defendant's motion to dismiss

8   Claim 15 is DENIED relative to Defendant Markus, based on an allegation that he unlawfully

9   detained Mrs. Hughey.

10         As to the City, Mrs. Hughey does not identify a custom, policy, or practice that was the

11   moving force behind Markus' committing an allegedly unlawful detention.  Therefore, the motion

12   to dismiss Claim 15 relative to the City is GRANTED.

13         F.   Claim 16 (Mr. Hughey): Excessive Use of Force and Unlawful Arrest by the City,

14              Sockman, and Fellows

15         Claim 16 alleges excessive force and unlawful arrest in connection with Mr. Hughey's

16   formal arrest and processing in the hospital the day after the incident.  Defendants argue that a

17   seizure occurred when Mr. Hughey was shot and continued until his arraignment and that the

18   formal arrest in the hospital was part of an ongoing seizure, rather than a separate incident.  (ECF

19   No. 50-1 at 12.)  Defendants assert that because the formal arrest at the hospital was part of one

20   continuous seizure, Fellows cannot be liable for unlawful arrest.  (ECF No. 50-1 at 12.)  Plaintiffs

21   counter that "Mr. Hughey was subjected to a variety of violations."  (ECF No. 52 at 12.)

22   However, Plaintiffs fail to address the substance of Defendants argument and do not provide any

23   legal authority demonstrating that the formal arrest in the hospital is sufficient to find Fellows

24   liable for unlawful arrest.

25         A seizure occurs "whenever [the officer] restrains the individual's freedom to walk away."

26

27   _____

     [17]      In her opposition, Mrs. Hughey also references Markus and Tyler ordering her to the ground at gunpoint, but
28   the fifteenth cause of action in the SAC refers only to Markus and the City, and specifically to Markus' questioning
     of Mrs. Hughey.  (ECF No. 52 at 16.)

1    *Robins v. Harum*, 773 F.2d 1004, 1009 (9th Cir. 1985).   "[O]nce a seizure has occurred, it

2    continues throughout the time the arrestee is in the custody of the arresting officer." *Id.*; *see*

3    *Fisher v. City of San Jose*, 558 F.3d 1069, 1077–78 (9th Cir. 2009) (en banc) (holding a long

4    standoff constituted one seizure which began at the initiation of the standoff and continued until

5    the formal arrest); *but see Hopkins v. Bonvicino*, 573 F.3d 752, 772 n.12 (9th Cir. 2009)

6    (distinguishing between the initiation of a seizure and formalizing that same seizure and two

7    separate yet overlapping incidents that create distinct seizures for fourth amendment purposes).

8           In *Fisher*, police were called to an apartment complex after a man threatened a security

9    guard and locked himself inside his apartment with weapons. *Fisher*, 558 F.3d at 1072–73.

10   Police in that instance initiated contact through yelling to the man in his apartment.  Police did

11   not physically seize Fisher or handcuff him until after the standoff was over.  The Ninth Circuit

12   held the incident constituted one seizure for 4th amendment purposes because a seizure does not

13   end until a reasonable person would feel at liberty to leave. *Id.* at 1078.  The Ninth Circuit noted

14   that Fisher would not feel at liberty to leave his home without being formally arrested at any point

15   during the standoff. *Id.*  Whereas in *Hopkins*, police handcuffed and removed a defendant from

16   inside his home, released him, and then a citizen's arrest occurred moments later in front of the

17   house. *Hopkins*, 573 F.3d at 761–72.

18          Here, like in *Hopkins*, Mr. Hughey was first handcuffed and seized within his home, but

19   was not formally arrested or charged until after the initial handcuffing and seizure.  However,

20   from the time Mr. Hughey was shot Plaintiffs allege facts to demonstrate that Mr. Hughey would

21   never have felt free to leave.  Plaintiffs allege "officers pinned Mr. Hughey to the floor and

22   handcuffed him before he was rushed for emergency, life-saving surgery."  (SAC ¶ 17.)  Plaintiffs

23   further allege WSPD denied Mr.Hughey visitors while he was at the hospital the day after the

24   shooting and remained in the room with Mr. Hughey when his lawyer visited.  (SAC ¶ 34.)  A

25   guard remained outside Mr. Hughey's hospital room.  (SAC ¶ 35–36.)  Additionally, Plaintiffs

26   allege WSPD shackled Mr. Hughey to his bed on July 11, 2012.  (SAC ¶ 36.)  Mr. Hughey

27   alleges he was not formally arrested until the afternoon of July 11, the day after the incident, and

28   at that time he was read his *Miranda* rights.  (SAC ¶ 41.)  Plaintiffs further allege Defendants

removed Mr. Hughey's shackles on July 13, after his attorney arranged for his bail to post.  (SAC ¶ 44.)  Taking Mr. Hughey's allegations as true, he has alleged one continuous seizure beginning at his residence and culminating in his formal arrest in the hospital a day after the initial seizure. Therefore, Fellows cannot be liable for the unlawful arrest or seizure that was a continuation of the seizure initiated by Wright.  *See Hopkins*, 573 F.3d at 772 n.12 (allowing two separate causes of action under § 1983 when the circumstances demonstrated two separate seizures under the Fourth Amendment).

Plaintiffs also bring this claim against Sockman.  The Court reads Plaintiffs allegations against Sockman as arising from Mr. Hughey being shackled to the bed until his attorney posted bail.  Plaintiffs allege that "Sockman ordered that the [sic] Mr. Hughey continued to be hand-cuffed to the bed until he was processed."  (SAC ¶ 207.)  "Mr. Hughey was released from his bed by Lt. Sockman after Mr. Hughey posted bail at the hearing several days later."  (SAC ¶ 207.) From these allegations, as well as the rest of claim 16, the Court cannot determine what Plaintiffs allege Sockman is liable for: excessive force or unlawful arrest.  Insofar as Plaintiffs seek to allege liability against Sockman for unlawful arrest, the claim fails for the same reasons as it fails against Fellows.   As to a claim of excessive force, Plaintiffs' allegations are inadequate.  As mentioned above[18], for a handcuffing to be considered excessive force the plaintiff must allege a demonstrable physical injury or unheeded complaints about excessive tightness.  Plaintiffs fail to make any such statements.

For the above stated reasons, the Court finds that Plaintiffs have failed to allege adequate facts to demonstrate that the formal arrest at the hospital constitutes an unlawful seizure against Fellows and that Sockman is liable for either unlawful arrest or excessive force.  The Court also finds Plaintiffs have not alleged the City has a policy, custom, or practice of unlawful arrests. Therefore, Defendants' motion to dismiss Claim 16 as to Fellows, Sockman and the City is GRANTED.

G.  <u>Claim 17: Unreasonable Search of Mr. Hughey's Person with an Invalid Warrant by</u>

---

[18]        See *supra*, section IV, subsection D.

the City and Fellows

In this cause of action Mr. Hughey contends the search conducted at the hospital was unreasonable because the warrant was improperly obtained. (SAC ¶ 212.) Defendants contend that the warrant was valid or in the alternative that the search was incident to a lawful arrest. The Fourth Amendment "provides that a warrant may not be issued without probable cause." *Fernandez v. California*, 134 S.Ct. 1126, 1131–32 (2014). Probable cause exists if there is a "fair probability that contraband or evidence of a crime will be found in a particular place," based on a totality of the circumstances. *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[A]n affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). For hearsay based on declarants other than the affiant, the magistrate judge is tasked with issuing a warrant based on the totality of the circumstances including the veracity and basis of knowledge of persons supplying hearsay information. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The magistrate judge must also be informed of the affiant's belief that any declarant involved is credible or his information reliable. *Ventresca*, 380 U.S. at 108. "Police officers may be presumed reliable." *United State v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986). "To prevail on a claim that the police procured a warrant through deception, the party challenging the warrant must show that the affiant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014).

Here, Plaintiffs allege Fellows took Wright's false statement. (SAC ¶ 18.) Plaintiffs also allege on the evening of the shooting Fellows interviewed neighbors who saw and heard Wright wrongfully shoot Mr. Hughey. (SAC ¶ 23.) Plaintiffs state the neighbors did not report witnessing any struggle between Wright and Mr. Hughey. (SAC ¶ 23.) Plaintiffs offer these few allegations in support of the conclusory statement that Fellows knew or had reason to know that Wright's statements were false when he prepared the affidavit to procure the search warrant. (SAC ¶ 212.) Plaintiffs' suggestion is supported by the search warrant the Court granted judicial notice of, which demonstrates that Fellows asked for the warrant two days after the incident when

1   both Wright's statement and the neighbors' statements were allegedly available to him.  (ECF No.

2   50-2, Ex. B.)  Plaintiffs have alleged enough information to call into question the reasonability of

3   Fellows reliance on Wright's testimony and not providing the neighbor's eye witness accounts.

4   Whether or not the warrant was valid rests on whether the magistrate judge's determination was

5   justified by the totality of the circumstances and is a question of fact which cannot be determined

6   at this juncture.  Therefore, Defendants' motion to dismiss Claim 17 as to Fellows is DENIED.

7         Plaintiffs do not allege facts suggesting that the City has a policy, practice, or custom

8   permitting unlawful searches based on invalid warrants.  Therefore, Defendants' motion to

9   dismiss Claim 17 as to City is GRANTED.

10        H.  <u>Claim 18: Unreasonable Search of the Hughey's  Home Without a Valid Warrant by</u>

11            <u>the City, Sockman and Fellows</u>

12        Plaintiffs allege City, Sockman, and Fellows conducted an unlawful search and seizure of

13   two computers and Mr. Hughey's cellphone in the Hughey residence.  (SAC ¶ 217.)

14        i.    *Fellows*

15        Defendants argue Fellows was not the affiant for the warrant nor was he the officer who

16   seized the property from the house.  (ECF No. 50-1 at 16.)  In support of their argument,

17   Defendants seek judicial notice of the search warrant under question.  (ECF No. 50-2, Ex. A.)

18   Search Warrant No. 12-197, granted police the ability to search the computers and phones seized

19   from the Hughey residence and an affidavit by Detective Ryan Lukins provided support for the

20   search warrant.[19]  (ECF No. 50-2, Ex. A at 1.)  The affidavit in support of the search warrant also

21   states the "CSI Pagano located and collected two apple brand laptop computers . . . as well as and

22   [sic] a I-Phone."  (ECF No. 50-2, Ex. A at 3.)  Plaintiffs argue Defendants unlawfully entered the

23   home after the shooting and unlawfully seized the computers and phones.  (ECF No. 53 at 15.)

24   Plaintiffs further assert the unlawful seizure is the underlying issue in the cause of action not the

25   subsequent warrant to search the already seized items.  (ECF No. 53 at 15.)

26        Plaintiffs specifically allege "Fellows unlawfully engaged in the search of the Hughey

27

28   [19]      Plaintiffs did not bring any claims against Detective Ryan Lukins in the instant action.

1   home without a warrant."  (SAC ¶ 217.)  Plaintiffs state "WSPD seized personal property (in the

2   form of electronic equipment) inside the home without a warrant."  (SAC ¶ 217.)  However, "[a]

3   claim has facial plausibility when the pleaded factual content allows the court to draw the

4   reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

5   556 U.S. 662, 678–79 (citing *Twombly*, 550 U.S. at 556).  Here, Plaintiffs have provided adequate

6   facts to demonstrate that Defendant Fellows may be liable for the seizure of the computers and

7   phone.  Defendant's presentation of the warrant simply makes who seized the items a question of

8   fact, which the Court cannot rule on in a motion to dismiss.  Therefore, Defendants' motion to

9   dismiss Claim 18 as to Fellows is DENIED.

10          *ii.   Sockman*

11          Plaintiffs assert Sockman is liable because he refused to return the personal property when

12   the Hughey's attorney requested it.  (SAC ¶ 217.)  Plaintiffs also allege Sockman lied about the

13   existence of a warrant and refused to produce the warrant.  (SAC ¶ 17.)  Additionally, Plaintiffs

14   allege the WSPD has not returned all of the Hugheys' electronic equipment despite a court order.

15   (SAC ¶ 28.)

16          Defendants suggest Sockman cannot be liable for withholding the computers and

17   cellphone when he was not the officer who seized the property.  (ECF No. 50-1 at 16.)

18   Additionally, Defendants assert Sockman cannot be liable for the refusal because at the time Mr.

19   Hughey's attorney requested the return, a warrant had been issued to search the contents of the

20   devices.  (ECF No. 50-1 at 17.)  The Court construes Plaintiffs' allegations to contend Sockman

21   was liable for not returning the computers and the cellphone when requested, but not for the

22   initial unlawful seizure.[20]  However, Plaintiffs do not allege that Sockman had any authority to

23   return the property and therefore cannot state a claim against him on this ground.  *Diaz v. State*,

24   No. C 94-20113 JW, 1995 WL 590358, at *2 (N.D. Cal., Oct. 3, 1995) (finding the plaintiff did

25   not state a claim against the individual who personally did not return the property when requested

26   _____

27   [20]      If Plaintiffs seek to allege Sockman is liable for the initial seizure, the claim fails because Plaintiffs do not
    allege any facts connecting Sockman to the seizures at the Hughey residence.  Plaintiffs do not allege that Sockman
    seized the items or that he directed others to seize the computers and cellphone.  Therefore insofar as Plaintiffs assert

28   such a claim, Defendants' motion to dismiss is GRANTED.

1    because the plaintiff did not allege that the individual had the authority to return the property).

2    Assuming *arguendo* that Plaintiffs alleged Sockman had the authority to return the

3    computers and cellphone, Plaintiffs still do not state a claim.  "A negligent or intentional

4    deprivation of property fails to state a claim under Section 1983 if the state has an adequate post

5    deprivation remedy."  Hudson v. Palmer, 468 U.S. 517, 533 (1984).  "California law provides an

6    adequate post-deprivation remedy for any property deprivation."  *Barnett v. Centoni*, 31 F.3d 813,

7    816–17 (citing Cal Gov't code §§ 810–895 as a statute providing remedy for property

8    deprivation).  As in *Smith v. County of Santa Cruz*, Plaintiffs' own allegations in the SAC suggest

9    that Plaintiff knew of this post-deprivation remedy.  *See Smith*, No.: 13-CV-00595 LHK, 2014

10   WL 3615492, at *8–9 (N.D. Cal. July 22, 2014).  "Notwithstanding a court order to return all the

11   Hugheys' electronic equipment, WSPD and the Yolo County District Attorney have failed to do

12   so."  (SAC ¶ 28.)  Accordingly, Plaintiffs acknowledge the post-deprivation remedy for

13   unauthorized seizure of property by a state agent.

14   Defendants' motion to dismiss Claim 18 as to Sockman is GRANTED.  Furthermore, the

15   claim is dismissed with prejudice because given the post-deprivation remedy amendment would

16   be futile.

17        *iii.    The City*

18   As to the City, Plaintiffs allege WSPD seized the computers and cellphone without a

19   warrant or any justification.  (SAC ¶ 28.)  Plaintiffs further allege "WSPD wrongfully seized he

20   [sic] computer and smartphone in an effort to engage in unlawful fishing expedition for some

21   form of evidence or anything to use against Mr. and Mrs. Hughey as part of the abuse, corruption

22   and conspiracy to protect its own."  (SAC ¶ 28.)  The above stated allegations provide fair notice

23   to the City to defend itself effectively against a claim of unlawful seizure of the two computers

24   and cellphone.  Taken as true, the allegations plausibly suggest an entitlement to relief based on

25   the initial seizure of the computers and cellphone.  However, insofar as Plaintiffs seek to assert

26   the City is liable for Sockman's refusal to return the items, the City would be granted the same

27   protection based on the availability of a post-deprivation remedy.  Therefore, Defendants' motion

28   to dismiss Claim 18 as to the CITY is DENIED with respect to the initial seizure and GRANTED

1    with prejudice with respect to the failure to return the property.

2        I.    Claim 19: Failure to Train and Supervise the City, Drummond and Sockman

3        i.    *The City*

4        Defendants assert that Plaintiffs do not allege facts sufficient to demonstrate a policy or

5    custom that the City fails to train officers.  Defendants point to their arguments in support of

6    dismissing Claim 11 for this proposition.  (ECF No. 50–1 at 17.)  In support of their allegations,

7    Plaintiffs provide a laundry list of other incidents of excessive force and constitutional violations.

8    (ECF No. 52 at 17–23.)

9        "Courts have found that 'in some circumstances a policy of inaction, such as of failing to

10   properly train employees, may form the basis for municipal liability.'"  *Johnson v. City of Vallejo*,

11   99 F. Supp. 3d 1212, 1218 (E.D. Cal. 2009) (citing *Hunter v. County of Sacramento*, 652 F.3d

12   1225, 1234 n.8 (9th Cir. 2011)).  Municipal liability for failure to train may only be found where

13   the policy of inaction amounts to deliberate indifference to the rights of the persons with whom

14   the officers come in contact.  *Hunter*, 652 F.3d at 1234 n.8.  The Supreme Court has defined

15   deliberate indifference "as a stringent standard of fault, requiring proof that a municipal actor

16   disregarded a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51,

17   61 (2011).  "The City's 'policy of inaction' in light of notice that its program will cause

18   constitutional violations 'is the functional equivalent of a decision by the city itself to violate the

19   constitution.'"  *Id.* at 61–62 (citing *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397,

20   410 (1997)).  "A pattern of similar constitutional violations by untrained employees is "ordinarily

21   necessary" to demonstrate deliberate indifference for the purposes of failure to train."  *Id.* at 62

22   (internal quotes omitted).

23       As discussed above in Claim 11, Plaintiffs effectively allege the City has a policy or

24   custom of excessive force amongst its officers.   For Plaintiffs' allegations to amount to a claim of

25   failure to train, Plaintiffs must have alleged a pattern of constitutional violations.  In this respect

26   Plaintiffs state or cite specific instances of excessive force claims against police in the SAC.

27   (SAC ¶¶ 104–113.)  Based upon these facts, Plaintiffs adequately present a pattern of

28   constitutional violations that is sufficient to allege deliberate indifference on the part of the City

1   for failure to train WSPD officers.   Defendants' motion to dismiss Claim 19 as to the City is

2   DENIED.

3         *ii.*     *Sockman and Drummond*

4        Defendants argue that Plaintiffs allege generic supervisor liability claims against Sockman

5   and Drummand and fail to present facts which meet the elements of a claim for supervisor

6   liability.  (ECF No. 50–1 at 17.)  Plaintiffs contend they allege facts demonstrating Sockman and

7   Drummond ratified Wright's conduct by finding a wrongful shooting occurred only after "they

8   became aware of their inability to cover up [Wright's] misconduct."  (ECF No. 52 at 22.)

9        Supervisor liability requires a showing of personal involvement in the constitutional

10   violation or a sufficient causal connection between the supervisor's conduct and the alleged

11   constitutional violation.  *Lemire v. California Dept. of Corrections and Rehabilitation*, 726 F.3d

12   1062, 1056–57 (9th Cir. 2013).  The causal connection may be established from: "1) [the

13   supervisor's] own culpable action or inaction in the training, supervision, or control of

14   subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is

15   made; or 3) for conduct that showed a reckless or callous indifference to the rights of others."

16   *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

17        With respect to Drummond, the complaint merely states because of his position as Police

18   Chief at the time of the incident, he had knowledge of the shooting.  (SAC ¶ 97; ¶ 147 "on

19   information and belief, Chief Drummond was also informed of the falsity of Officer Wright's

20   statement and failed to authorize the release of Mr. Hughey."; ¶ 166 "Plaintiff's constitutional

21   rights as set forth herein occurred as a result of the widespread and settled custom, usage, practice

22   and/or policy… and their inadequate implementation by Defendants Dan Drummond and Tod

23   Sockman.")  Plaintiffs do not allege any act or failure to act on the part of Drummond that would

24   demonstrate a causal link between Drummond and the acts of WSPD officers that are the basis

25   for the underlying constitutional violation allegations.

26        As to Sockman, the complaint alleges more facts against Sockman as he was a direct

27   participant in the investigation following the shooting.  (SAC ¶ 38 "Lt. Sockman falsely and

28   intentionally stated that a warrant was obtained"; ¶ 42 "Lt. Sockman was once again on notice

1   that there existed an entirely different version of events and he should investigate the conduct and

2   statement from Officer Wright"; ¶ 96 "Lt. Sockman was also responsible for supervising

3   personnel officers underneath Tyler which included Wright and Markus.")  However, these facts

4   relate to Sockman's participation after the shooting and do not demonstrate a causal connection

5   between the shooting and actions or inactions by Sockman that would state a claim for relief.  As

6   such, Defendants' motion to dismiss Claim 19 as to Drummond and Sockman is GRANTED.

7   **V.    CONCLUSION**

8   For the foregoing reasons, the Court orders as follows:

9   1.  Defendants' Motion to Dismiss Claim 11 is DENIED;

10  2.  Defendants' Motion to Dismiss Claim 12 is DENIED as to Sockman and Fellows and

11      GRANTED WITH LEAVE TO AMEND as to Markus and Tyler;

12  3.  Defendants' Motion to Dismiss Claim 13 is DENIED;

13  4.  Defendants' Motion to Dismiss Claim 14 is GRANTED WITH LEAVE TO AMEND

14      as to the City, Markus and Tyler;

15  5.  Defendants' Motion to Dismiss Claim 15 is DENIED as to Markus and GRANTED

16      WITH LEAVE TO AMEND as to the City;

17  6.  Defendants' Motion to Dismiss Claim 16 is GRANTED WITH LEAVE TO AMEND

18      as to the City, Fellows, and Sockman;

19  7.  Defendants' Motion to Dismiss Claim 17 is GRANTED WITH LEAVE TO AMEND

20      as to the City and DENIED as to Fellows;

21  8.  Defendants' Motion to Dismiss Claim 18 is GRANTED WITHOUT LEAVE TO

22      AMEND as to Sockman and DENIED as to the City and Fellows; and

23  9.  Defendants' Motion to Dismiss Claim 19 is DENIED as to the City and GRANTED

24      WITH LEAVE TO AMEND as to Sockman and Drummond.

25  Plaintiffs are granted thirty (30) days from the date of this Order to file a Third Amended

26  Complaint.  Plaintiffs are not permitted leave to amend beyond the confines of this order.

27  IT IS SO ORDERED.

28

Dated: February 13, 2017

_____
Troy L. Nunley
United States District Judge